# EXHIBIT E-2

IN THE CIRCUIT COURT OF THE 9TH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO.

BARBARA BEST and
DAVID BEST,

      Plaintiffs,

v.

JOHNSON & JOHNSON,
JOHNSON & JOHNSON CONSUMER
COMPANIES, INC., and
PUBLIX SUPER MARKETS, INC.

      Defendants.

_____/

## **COMPLAINT**

Plaintiffs, BARBARA BEST and DAVID BEST, by and through undersigned counsel sues the Defendants, JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER COMPANIES, INC., and PUBLIX SUPER MARKETS, INC., and as grounds therefore states the following:

## **NATURE OF ACTION**

1.    Defendants, JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER COMPANIES, INC, ("Defendants") manufacture, distribute, market, and sell Johnson's Baby Powder ("Baby Powder"). Johnson's Baby Powder is comprised entirely of talc with a small amount of fragrance. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth.

2.    Defendants market the Baby Powder as a means of eliminating friction on the skin and absorbing moisture, while keeping skin cool and comfortable. Defendants market the Baby Powder for use on infants "after every bath and diaper change" and for women to "[u]se anytime

you want skin to feel soft, fresh and comfortable."

3.      Plaintiffs, BARBARA BEST and DAVID BEST, in reliance on Defendants' false representations about its product used their baby powder in her genital area for many years resulting in ovarian cancer.

4.      Johnson's Baby Powder is not safe.  As numerous studies have confirmed, Johnson's Baby Powder leads to a significant increased risk of ovarian cancer.  Women who used talc-based powders to powder their genital area have a 33% increased risk of ovarian cancer compared to those women who never used the powders.

5.      Despite the potential catastrophic health consequences, Defendants do not warn consumers about the dangers associated with the talc-based Johnson's Baby Powder.  Instead, Defendants continue to expressly and impliedly represent that the product is safe and intended for women to use the Baby Powder in the very manner most likely to result in an increased risk of ovarian cancer.

6.      As recently as 2016, Defendants issued the following statement: "We have no higher responsibility than the health and safety of consumers who rely on our products.  It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

7.      As a result of Defendants' misrepresentations and omissions regarding the safety of Johnson's Baby Powder, Plaintiffs purchased a product which is potentially lethal.

## JURISDICTION AND VENUE

8.      This is an action for damages that exceeds Fifteen Thousand Dollars ($15,000.00), exclusive of costs and fees.

9.      This Court has personal jurisdiction over Defendants, JOHNSON & JOHNSON,

JOHNSON & JOHNSON CONSUMER COMPANIES, INC., and PUBLIX SUPER MARKETS, INC. because they are authorized to conduct and do conduct business in Florida. They have marketed, promoted, distributed, and sold Johnson's Baby Powder in Florida, including in Orange County, and they have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

10.     Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because the cause of action accrued in Orange County because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while she resided in this judicial district.

## PARTIES

11.     Plaintiffs, BARBARA BEST and DAVID BEST, reside and are domiciled in Orange County, Florida. Plaintiffs have, for over forty (40) years, purchased for personal use Johnson's Baby Powder, and used it on a regular basis. Plaintiffs regularly purchased Johnson's Baby Powder from Defendant Publix Super Markets, Inc. in Florida.

12.     Defendant, JOHNSON & JOHNSON ("J&J"), is a New Jersey corporation with its principle place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J is in the business of manufacturing and selling consumer products. J&J marketed, distributed, and sold Johnson's Baby Powder products in Florida, including in Orange County.

13.     Defendant JOHNSON & JOHNSON CONSUMER COMPANIES, INC. is incorporated under the laws of the State of New Jersey. Defendant's corporate headquarters is located at 199 Grandview Road Skillman, New Jersey 08558. Johnson & Johnson Consumer Companies, Inc. operates as a subsidiary to Johnson & Johnson. Defendant researches, develops, manufactures, distributes, markets, and sells consumer products targeted at babies and mothers,

including Johnson's Baby Powder. Defendant marketed, distributed, and sold Johnson's Baby Powder products in Florida, including in Orange County.

14.     Defendant PUBLIX SUPER MARKETS, INC. ("Publix") is incorporated under the laws of the State of Florida. Publix's principal place of business is at 3300 Publix Corporate Parkway, Lakeland, FL 33811. Publix is engaged in the business of selling, among other consumer items, Johnson's Baby Powder products in Florida, including in Orange County. Publix submitted itself to the jurisdiction of this Court by doing, personally or through its agents, conducting and engaging in substantial business and other activities in Florida by selling consumer items, including Johnson's Baby Powder products, and introducing Johnson's Baby Powder products into the stream of commerce in Orange County.

## FACTUAL ALLEGATIONS

15.     In 1893, Defendants developed Johnson's Baby Powder. For decades Defendants have manufactured, distributed, marketed and sold Johnson's Baby Powder as a daily use powder intended to eliminate friction on the skin and to absorb unwanted excess moisture for both babies and women.

16.     Defendants have consistently marketed Johnson's Baby Powder for use on women to maintain freshness and cleanliness. Historically, the Baby Powder label and advertising encouraged women to dust themselves with the Baby Powder daily to mask odors.

17.     Although the label has changed over time, the message is the same: that the product is safe for use on women as well as babies. The Baby Powder label currently states that "Johnson's Baby Powder is designed to gently absorb excess moisture helping skin feel comfortable. Our incredibly soft, hypoallergenic, dermatologist and allergy-tested formula glides over skin to leave it feeling delicately soft and dry while providing soothing relief." Defendants instruct consumers

on the product labeling to "Shake powder directly into your hand, away from the face, before smoothing onto the skin."

    18.    Representative product packaging and labeling for Johnson's Baby Powder appears as follows:





19.     Through other marketing, including on their website for Johnson's Baby Powder, Defendants similarly encouraged women to use the product daily. Defendants state that Johnson's Baby Powder "keeps skin feeling soft, fresh and comfortable. Johnson's Baby Powder helps eliminate friction while keeping skin cool and comfortable. It's made of millions of tiny slippery plates that glide over each other to help reduce the irritation caused by friction." Under a heading "How to Use," "For skin that feels soft, fresh and comfortable, apply Johnson's Baby Powder close to the body, away from the face. Shake powder into your hand and smooth onto skin." Under a heading "When to Use," Defendants recommend that consumer "Use anytime you want skin to feel soft, fresh and comfortable. For baby, use after every bath and diaper change."

20.     Defendants seek to convey an image as a safe and trusted family brand. For example, on their website for Johnson's Baby Powder, Defendants state the product is "Clinically proven to be safe, gentle and mild."

21.     Defendants also have a website, www.safetyandcarecommitment.com, devoted to "Our Safety & Care Commitment." According to Defendants, "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed." Defendants market a "Five-Level Safety Assurance Process," which they describe as follows: "for decades, ours has been one of the most thorough and rigorous product testing processes in our industry – to ensure safety and quality of every single product we make." Defendants' so-called "Promise to Parents and their Babies" includes that "[w]hen you bring our baby care products into your home, you can be assured of our commitment to the safety of your family and families around the world." Nowhere do Defendants warn of the increased risk of ovarian cancer linked to the use of Johnson's Baby Powder.

22.      On May 12, 2014, Defendants issued the following statement: "We have no higher responsibility than the health and safety of consumers who rely on our products. It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies." *See* Fox 32 Chicago, *Popular Baby Powder Allegedly Caused Cancer In Pro-Figure Skater* (May 12, 2014), *available at*: http://www.myfoxchicago.com/story/25497847/popular-baby-powder-allegedly-caused-cancer-in-pro-figure-skater.

23.      Johnson's Baby Powder is made entirely of talc and fragrance. Talc is a mineral composed of hydrated magnesium silicate that is mined from the earth. It is an inorganic material. Talc is used in to manufacture goods, such as paper making, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in the Baby Powder, talc is known as "talcum powder."

24.      As detailed below, beginning in at least 1982, Defendants were aware of several studies that demonstrated that women who used talc-based baby powder in the genital area had a significant increased risk of ovarian cancer. Since 1982, there have been 21 studies by doctors and scientists throughout the world (including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study) that reported an elevated risk for ovarian cancer with genital talc use. The majority of these studies show a statistically significant increased risk of ovarian cancer.

25.      However, Defendants do not warn or inform consumers anywhere, including on the product labeling or in its marketing or advertising for the product, that use of Johnson's Baby Powder may be harmful to health, including significantly increasing the risk of ovarian cancer.

26.      Research conducted as early as 1961 showed that particles similar to talc can translocate from the exterior genital area to the ovaries of women. *See* Egi, G.E. and Newton, M.,

*The transport of carbon particles in the human female reproductive tract*, 12 Fertil. Steril. 151-155 (1961).

27.     Because of the potential for transmission, researchers remained concerned about the carcinogenic nature of talc and the effects of talc use. A 1968 study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." Cralley LJ, et al., *Fibrous and mineral content of cosmetic talcum products*, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968). In a 1976 follow up study, researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl AN, et al, *Consumer talcums and powders: mineral and chemical characterization*, 2 J. Toxicol. Environ. Health 255-284 (1976).

28.     The first study to suggest a link between ovarian cancer and talc powder use was conducted in 1971. In that study, researchers found talc particles "deeply embedded" in 10 of 13 ovarian tumors, 12 of 21 cervical tumors, one primary carcinoma of the endometrium, and 5 of 12 "normal" ovaries from women with breast cancer. Henderson, W.J., et al., *Talc and carcinoma of the ovary and cervix*, 78 (3) J. Obstet. Gynaecol. Br. Commonw. 266-272 (1971).

29.     The scientific evidence linking talc use and ovarian cancer continued to build. In 1982, Daniel Cramer of the Departments of Obstetrics, Gynecology, and Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the Department of

Epidemiology, Harvard School of Public Health and the Department of Pathology, Massachusetts General Hospital, Harvard Medical School, conducted a case-control study which found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the substance of the ovary causing foreign body reaction and growth of epithelial ovarian tissue. The study found a statistically significant 92% increased risk of ovarian cancer from genital talc use. This study proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer. This study was funded by a grant from National Institutes of Health (NIH). Cramer, D.W., et al., *Ovarian cancer and talc: a case control study*, 50 Cancer 372-376 (1982). Soon after this study was published, Dr. Cramer was contacted and visited by Dr. Bruce Semple from J&J whereby Dr. Cramer advised Dr. Semple to place a warning on his company's talc based body powders regarding the increased risk of ovarian cancer.

30.      Nearly all of the talc-ovarian cancer studies have reported an elevated risk for ovarian cancer associated with perineum use of talcum powder and the majority of the studies show statistically significant elevations.

31.      In 1983, Patricia Hartge and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washington University Medical Center, performed a case-control study and found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P. et al., *Talc and ovarian cancer*, JAMA 1983, 1844.

32.      Similarly, in 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the perineum before their cancer diagnosis. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their perineum and a positive dose-

response relationship. *See* Whittemore, A.S., et al., *Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee*, Am. J. Epidemiol. 1228-1240 (1988).

33.     Another case control study conducted in 1989 found similar results. The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once per week. *See* Booth, M. et al., *Risk factors for ovarian cancer: a case-control study*, Br. J. Cancer, 592-598 (1989).

34.     A case control study conducted in 1989 by Bernard Harlow, et al., of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing and found a statistically significant 180% increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum. This study also found a positive dose-response relationship. Harlow, B.L. & Weiss, N.S., *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, Am. J. Epidemiol., 390-394 (1989).

35.     In 1992, a case-control study was conducted by Karin Rosenblatt, et al., from the Department of Epidemiology, The Johns Hopkins School of Hygiene and Public Health and Department of Gynecology and Obstetrics. This study that found a 70% increased risk in women from genital talc use and found a 379% increased risk of ovarian cancer of women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. et al., *Mineral fiber exposure and the development of ovarian cancer*, 45 (1) Gynecol. Oncol. 20-25 (1992).

36.     Additionally, a 1992 case-control study conducted by Yong Chen, et al., of 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an

elevated risk of 290% for ovarian cancer for women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, Int. J. Epidemiol., 23-29 (1992).

37.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats." Accordingly, talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No 421 (Sept. 1993).

38.    In 1995, a case control study was conducted in Australia by David Purdie, et al., involving over 1600 women. This was the largest study of its kind to date. This study found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum. Purdie, D., et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group*, 62 (6) Int. J. Cancer 678-684 (1995).

39.    In 1996, a case-control study similarly found a statistically significant 97% increased risk of ovarian cancer in women who used talc-based powders in their genital area. *See* Shushan, A., et al, *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 (1) Fertil. Steril. 13-18 (1995).

40.    In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer. "Concern about talc as an ovarian carcinogen goes back 50 years in the medical literature. By the 1970s, evidence was mounting that talc particles might migrate into

a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer." McCullough, Marie, *Women's health concerns prompt condom makers to stop using talc*, Jersey Journal (City Edition) (April 17, 1996).

41.     In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. *See* Cook, L.S., et al., *Perineal powder exposure and the risk of ovarian cancer*, Am. J Epidemiol. 145, 459-465 (1997).

42.     In 1997, a case-control study was conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine which included over 1,000 women. The study found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineum. The study indicated that "Commercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc. When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found." The study concluded, "The results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated." Chang, S. & Risch, H.A., *Perineal talc exposure and risk of ovarian carcinoma*, 79 (12) Cancer 2396-2401 (1997).

43.     In a 1998 case-control study conducted in Canada by Beatrice Godard, et al., a 149% increased risk of ovarian cancer was found in women who used talc-based powders on their

perineum. Godard, B., et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*, 179 (2) Am. J. Obstet. Gynecol. 403-410 (1998).

44.     Daniel Cramer from the Obstetrics-Gynecology Epidemiology Center, Department of Obstetrics and Gynecology, Brigham and Women's Hospital conducted another case-control study in 1999 of 563 women newly diagnosed with epithelial ovarian cancer and 523 control women. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum. "We conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute (NCI). Cramer, D.W., et al, *Genital talc exposure and risk of ovarian cancer*, 81 (3) Int. J. Cancer 351-356 (1999).

45.     In 2000, Roberta Ness, et al., from University of Pennsylvania, produced a case-control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation and that inflammation contributes to cancer cell development. Ness, R.B., et al., *Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer*, 11 (2) Epidemiology 111-117 (2000).

46.     Also in 2000, a prospective cohort study considered to be the most informative study to date, found a 40% increase in invasive serous cancers from women who applied talcum powder to their perineum. Gertig, D.M., et al., *Prospective study of talc use and ovarian cancer*, 92 J. Natl. Cancer Inst. 249-252 (2000).

47.     In 2004, Paul Mills, Deborah Riordan, Rosemary Cress and Heather Young of Cancer Registry of Central California – Public Health Institute, Fresno, California; Fresno Medical Education Program, University of California, San Francisco, Fresno, California; California Cancer Registry, Sacramento, California; and the Department of Epidemiology and Biostatistics, George Washington University School of Public Health and Health Services, performed a case-control study of nearly 1400 women from 22 counties in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. The study looked at women's use of cornstarch powders and found no increased risk in ovarian cancer in women who used these types of powders on the perineum as "Cornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded by stating that "users should exercise prudence in reducing or eliminating use. In this instance, the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures, talcum powder use is easily avoidable." Mills, P.K., et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 Int. J. Cancer 458-64 (2004).

48.     In 2007, Amber Buz'Zard and Benjamin Lau performed a study whereby they induced carcinogenesis by applying talc to normal human epithelial and granulosa ovarian cancer cell lines. Buz'Zard A.R., et al., *Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures*, 21 (6) Phytother. Res. 579-586 (2007).

49.    In 2008, Margaret Gates, of Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School; Departments of Epidemiology and Biostatistics, Harvard School of Public Health; Obstetrics and Gynecology Epidemiology Center, Brigham and Women's Hospital, and Norris Cotton Cancer Center, Dartmouth- Hitchcock Medical Center, performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study with additional cases and years of follow up from these studies (the "Gates Study"). This study was funded by the National Cancer Institute (NCI), and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use. A 60% increased risk of the serous invasive subtype was also found.

50.    Dr. Gates found a strong and positive dose-response relationship whereby increased risk was seen with higher talc usage in women. Dr. Gates commented about this study saying these latest results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer." She also stated that "the finding of highly significant trends between increasing frequency of use and risk 'strengthens the evidence of an association, because most previous studies have not observed a dose response.'" It was concluded that, "We believe that women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk. Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped." Dr. Gates further stated that "An alternative to talc is cornstarch powder, which has not been shown to increase ovarian cancer risk, or to forgo genital powder use altogether." Gates, M.A., et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 (9) Cancer Epidemiology, Biomarkers & Prev. 2436-2444 (2008).

51.     In May 2008, the CPC, joined by its chairman and numerous other physicians and chairs of public health and medical associations, submitted a citizen's petition "seeking a cancer warning on cosmetic talc products."[1] *The petition sought to require all cosmetic talc products to bear labels with warnings* such as, "Frequent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer" or "Frequent talc application in the female genital area *is responsible* for major risks of ovarian cancer." (emphasis added). The petition cited numerous studies and publications and sought a hearing to present scientific evidence.

52.     In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society commented on the Gates Study. He stated the dose-response relationship between talc and ovarian cancer had finally been satisfied by this study. Dr. Thun said, "There are very few modifiable risk factors for ovarian cancer. The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation." Chustecka, Zosia & Lie, Desiree, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (2008).

53.     In 2008, Melissa Merritt, from the Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women where a statistically significant 17% increased risk of ovarian cancer for women who used talc on their perineum was confirmed. This study also confirmed a statistically significant 21% increased

---

[1] The petition was submitted on behalf of: Samuel S. Epstein, M.D., Chairman, CPC, and Professor emeritus Occupational and Environmental Medicine, University of Illinois at Chicago School of Public Health; Peter Orris, M.D., Professor and Chief of Service, University of Illinois at Chicago Medical Center; Quentin Young, M.D., Chairman, Health and Medicine Policy Research Group, Chicago; Rosalie Bertell, Ph.D., International Association for Humanitarian Medicine, Scientific Advisor to the International Institute of Concern for Public Health, Toronto, and the International Science Oversight Board of the Organic Consumers Association, Washington, D.C.; and Ronnie Cummins, National Director of the Organic Consumers Association.

risk of ovarian cancer of a serous subtype in women who used talc on their perineum. Merritt, M.A., et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 (1) Int. J. Cancer 170-176 (2008).

54.     In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use. The study concluded by stating, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Wu, A.H., et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 (6) Int. J. Cancer 1409-1415 (2009).

55.     In 2011, Daniel Cramer of Brigham and Women's Hospital, Harvard Medical School, made public another case-control study of over 4,000 women. This study, which was funded by the National Cancer Institute (NCI), found a 200% to 300% increased risk of ovarian cancer for women who applied talc-based body powders to their perineum. This study found a strong dose-response relationship and explained why the dose-response has been under reported in prior studies. In commenting on this study, Dr. Cramer stated "I have always advised gynecologists, if they examine a woman and see that she is using talc in the vaginal area, tell her to stop . . . There are alternatives. This study strongly reinforces that advice."

56.     In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use in women. Rosenblatt, K.A., et al., *Genital powder exposure and the risk of epithelial ovarian cancer*, 22 Cancer Causes Control 737-742 (2011).

57.     In June of 2013, Kathryn Terry, et al., published a pooled analysis of over 18,000 women in eight case-control studies and found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, K.L., et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6 (8) Cancer Prevention Research, 81-82 (2013).

58.     In addition to the numerous case control studies over the last several decades, several meta-analyses were conducted on the topic of talcum powder use and ovarian cancer. A meta-analysis is a statistical technique that allows similar measures of the same illness and exposure from different studies to be combined to determine whether an association exists. All analyses found a significant positive association between the use of talcum powder in the genital area and ovarian cancer.

59.     In 1992, the National Cancer Institute sponsored the first meta-analysis conducted by Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and Women's Hospital. This was the most comprehensive study to date whereby 235 cases with ovarian cancer were compared to 239 controls. Through personal interviews with these women Harlow and Cramer found that nearly 17% of the control group reported frequent talc application to the perineum. The study found "the most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals) . . . . Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." The study concluded that "a lifetime pattern of talc use may increase the risk for epithelial ovarian cancer," and that "[g]iven the poor prognosis for ovarian cancer, any potentially harmful exposures

should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Harlow, B.L. et al., *Perineal exposure to talc and ovarian cancer risk*, Obstet. Gynecol. 1992, 19-26. The summary odds ratio (and 95% confidence interval) was 1.3 (1.1, 1.6) indicating a statistically significant 30% increased risk of ovarian cancer from genital talc use.

60.     In 1995, a second meta-analysis conducted by A. J. Gross and P. H. Berg included data from nine separate papers, which yielded a summary odds ratio (based upon the crude measures) of 1.27 (1.09, 1.48) – again a statistically significant 27% increased risk of ovarian cancer from genital talc use. *See* Gross, A.J. & Berg, P.H., *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer*, 5 (2) J. Expo. Anal. Environ. Epidemiol. 181-195 (1995).

61.     David Cramer performed the third meta-analysis in 1999 supported by the National Cancer Institute. It included all of the studies in the Gross and Berg meta-analysis plus four new studies as well as the odds ratio based upon a new series of 563 cases with ovarian cancer and 523 controls from Massachusetts and New Hampshire. The summary odds estimate was 1.39 (1.24, 1.49), again a statistically significant 39% increased risk of ovarian cancer from genital talc use.

62.     In 2003, a fourth meta-analysis funded by the industry re-analyzed data from 16 studies published prior to 2003 and found a 33% increase in ovarian cancer risk among talc users. *See* Huncharek, M., et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies*, 23 Anticancer Res. 1955-60 (2003).

63.     In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer

causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

64.    As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a "risk factor" for ovarian cancer. Additionally, the Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology University of Vermont publish a pamphlet entitled "Myths & Facts about ovarian cancer: What you need to know." This pamphlet is given to all ovarian cancer patients at nearly every medical facility in the United States. In this pamphlet under "known" risk factors for ovarian cancer is "Use of Talc (Baby Powder) in the Genital Area." Similarly, on the Sanford Medical Center website for "patient information" regarding ovarian cancer it lists "Talcum powder dusted on the perineum" as a risk factor for contracting ovarian cancer.

65.    As early as 1982, Defendants were acutely aware of the scientific evidence linking ovarian cancer and perineal use of talcum powder. In an August 12, 1982, New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," Defendants admitted being aware of the 1982 Cramer study that concluded women were three times more likely to contract ovarian cancer after daily use of talcum powder in the genital area.

66.    On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter to then J&J's CEO, Ralph Larson, informing Defendants that studies as far back as 1960's "show[] conclusively that the frequent use of talcum powder in the genital area poses a serious risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a

low survival rate. The letter concluded by requesting that Defendants withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.

67.      On September 17, 1997, Alfred Wehner a toxicology consultant retained by Defendants, wrote a letter to Michael Chudkowski, manager of Pre-Clinical Toxicology at Johnson & Johnson Consumer Products, Inc., stating that on three separate occasions the Talc Interested Party Task Force (TIPTF) of the Cosmetic, Toiletry, and Fragrance Association (CTFA) which included Defendants and Luzenac (Defendants' supplier of talc), had released false information to the public about the safety of talc. Specifically addressing a November 17, 1994, statement released by the CTFA, Dr. Wehner said the following:

> The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: "The workshop concluded that, although some of these studies suggested a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate, to phrase it euphemistically. At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary.
>
> The workshop did not conclude that "the results of the studies are insufficient to demonstrate any real association." As pointed out above, a "real" statistically significant association has been undeniably established independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper Debra Heller, and others.

68.      In 2006, Imerys began placing an ovarian cancer warning on its Material Safety Data Sheets (MSDS) it provides to Defendants. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification

of talc as well. Although Defendants admittedly received these MSDSs, they never passed this warning information on to the consumers. On September 26, 2012, the corporate representative of Imerys testified in open court that his company exclusively supplied Defendants with talc used for its Baby Powder product and that ovarian cancer is a potential hazard associated with a women's perineal use of talc-based body powders, like Defendants' Baby Powder.

69.     On October 19, 2012, Defendants' former in-house toxicologist and current consulting toxicologist, Dr. John Hopkins, testified on Defendants' behalf that Defendants "[are] and were aware of . . . all publications related to talc use and ovarian cancer."

70.     On October 4, 2013, a jury in South Dakota Federal Court, in the case styled *Deane Berg v. Johnson & Johnson Consumer Companies, Inc.,* unanimously found that Johnson & Johnson Consumer Companies, Inc. caused the plaintiff's ovarian cancer and was negligent in failing to warn about cancer hazards on its talc-based body powders, specifically, Baby Powder and Shower to Shower.

71.     Despite the overwhelming scientific and medical evidence regarding talc use and ovarian cancer that has developed over the past several decades, the only warnings on the Baby Powder label are to "Keep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." Defendants provide similar warnings on their website: "For external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

72.     None of Defendants' warnings on the product label or in other marketing informed Plaintiffs and Class members that use of the product in the genital area, as was encouraged by

Defendants, could lead to an increased risk of ovarian cancer. Instead, Defendants continue to represent on the labeling and other marketing that Johnson's Baby Powder is "clinically proven mildness," "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

73.     Johnson's Baby Powder is advertised for use by women and does not instruct that the product may lead to an increased risk for ovarian cancer when used in the genital area, but instead that the product is clinically proven safe and mild.

74.     That Johnson's Baby Powder was safe for use by women when, in fact, it is not, is a material fact. Defendants understood that consumers, including Plaintiff, would attach importance to the existence and truth of the representations made in deciding whether to purchase its products and would consider such objective statements of fact material.

75.     Despite Defendants' knowledge, Defendants failed to inform Plaintiff and its other customers of material facts and misrepresented material facts in connection with the sale of Johnson's Baby Powder with intent that others rely upon the concealment, suppression, omission, or misrepresentation of such material facts.

76.     Defendants' omissions and representations constitute deception, fraud, false pretense, false promise, misrepresentation, omission, concealment and suppression of material information and a failure to inform Plaintiff of a material fact in connection with the sale of merchandise.

77.     Plaintiff purchased Johnson's Baby Powder primarily for personal and family purposes.

78.     As a result of Defendants' above-described representations, misrepresentations and omissions, Plaintiff has suffered an ascertainable loss of money by purchasing a dangerous product advertised as a safe product.  Plaintiff has suffered ovarian cancer.

79.     Defendants, by contrast, reaped and continue to reap enormous profits from their deceptive marketing and sale of Johnson's Baby Powder.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### Against Johnson & Johnson Defendants

80.     Plaintiffs adopt and reallege paragraphs 1 – 79 above.

81.     Defendants manufactured a product known and described as "Johnson's Baby Powder."

82.     Defendants warranted that the product was reasonably fit for its intended use as a feminine hygiene product.

83.     The product was unreasonably dangerous for use as intended causing ovarian cancer to the Plaintiff.

84.     As a result, Plaintiffs were injured, suffered pain therefrom, incurred medical expenses in the treatment of her injuries.  The injuries are either permanent or continuing in nature and Plaintiffs will suffer the injuries and impairment in the future.

WHEREFORE, Plaintiffs demands judgment for damages against defendants and trial by jury.

### SECOND CAUSE OF ACTION
### STRICT LIABILITY
### Against Johnson & Johnson Defendants

85.     Plaintiffs adopt and reallege paragraphs 1 – 79 above, and states:

86. Defendant sold its baby powder with a defect in the product which causes an unreasonable risk of ovarian cancer.

87. The defect, the talc within the product, was the cause of Plaintiff's ovarian cancer.

88. Defendant knew or reasonably should have known of the increased risks of ovarian cancer from the use of its product and failed to warn consumers including Plaintiffs of those risks.

89. As a result of Plaintiff's failure to warn, Plaintiff used the product resulting in ovarian cancer, suffered pain therefrom, incurred medical expense in the treatment of her injuries. The injuries are either permanent or continuing in nature and Plaintiffs will suffer the injuries and impairment in the future.

WHEREFORE, Plaintiffs demands judgment for damages against Defendants and trial by jury.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### Against Johnson & Johnson Defendants

90. Plaintiffs adopt and reallege paragraphs 1 – 79 above.

91. Notwithstanding overwhelming medical evidence of the danger associated with the use of talcum powder for feminine hygiene, Defendants marketed and sold their product knowing it would be used for that purpose.

92. Defendants owed a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing and selling talcum powder.

93. Despite Defendants' knowledge, they failed to inform Plaintiffs and other customers of material facts and misrepresented material facts in connection with the sale of its baby powder with intent that others rely upon the concealment, suppression, omission, or misrepresentations of such material facts. Defendants' breached their duty of care.

94.     In addition, Defendants' omissions and representations constitute a deception, fraud, false pretense, misrepresentation, omission, and concealment of material facts in connection with the sale of merchandise.

95.     As a direct and proximate cause of Defendants' negligence as above described, Plaintiff has suffered ovarian cancer, was injured, suffered pain, incurred medical expense, the injuries are permanent or continuing in nature and she will suffer the losses and impairment in the future.

**FOURTH CAUSE OF ACTION**
**FRAUD**
**Against Johnson & Johnson Defendants**

96.     Plaintiffs adopt and reallege paragraphs 1-79 above.

97.     Defendants falsely represented that Johnson's Baby Powder was safe for use by women when, in fact, it was not.

98.     Defendants represented on the labeling and other marketing that Johnson's Baby Powder is "clinically proven mildness," "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

99.     Defendants failed to inform Plaintiffs and its other customers of material facts and misrepresented material facts in connection with the sale of Johnson's Baby Powder with intent that others rely upon the concealment, suppression, omission, or misrepresentation of such material facts.

100.    At all relevant times, Defendants had a duty to disclose the nature and extent of what they knew regarding the safety (or lack thereof) of the Johnson's Baby Powder.

101.   At all relevant times, Defendants knew that talc-based body powder is possibly carcinogenic to humans; Defendants knew the substance and conclusions of the scientific literature discussed in this complaint; Defendants edited scientific reports that were submitted to governmental agencies.  In fact, Defendants were the primary contributors to the Talc Interested Party Task Force (TIPTF), which would convene in the 1980s and 1990s to defend talc in response to epidemiologic studies that found an association between ovarian cancer and genital talc use. TIPTF hired scientists to perform biased research regarding the safety of talc.  Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, and talc based body products to the public.

102.   At all relevant times, Plaintiffs were aware that Defendants marketed their product as safe for human use.

103.   At all relevant times, Plaintiffs were aware that Defendants represented their product as safe for human use.

104.   At all relevant times, Plaintiffs were under the impression Defendants Baby Powder, if safe for a baby, including a baby's genital area, would be safe for Plaintiff's use as well.

105.   At all relevant times, Plaintiffs were familiar with the packaging and labeling on the Baby Powder.  Plaintiff would see the packaging when she bought the Baby Powder.  Given what Defendants knew about the serious dangers of the Baby Powder, Plaintiffs would expect Defendants to communicate said dangers by a warning, advertisements, and/or other public safety communications.  Defendants, however, never publicized the dangers it knew.

106.   At all relevant times, Plaintiffs were not aware that Defendants representations were false, and Plaintiffs were not aware of the material information they were concealing.

Plaintiffs were not aware that Defendants were created biased and junk science to cast doubt on the associations of talc and ovarian cancer.

107.    Plaintiffs reasonably relied on Defendants representations and material omissions, and, in reliance, purchased and used the Johnson's Baby Powder.

108.    Plaintiff's reliance was justified.

109.    But for Defendant's representations or material omissions, Plaintiffs would not have purchased Johnson's Baby Powder.

110.    As a direct and proximate cause of Defendants' fraud as above described, Plaintiff has suffered ovarian cancer, was injured, suffered pain, incurred medical expense, the injuries are permanent or continuing in nature and she will suffer the losses and impairment in the future.

### FIFTH CAUSE OF ACTION
### STRICT LIABILITY
### Against Publix

111.    Plaintiffs adopt and reallege paragraphs 1-79 above.

112.    Publix engages in the business of selling and distributing Johnson's Baby Powder products in Florida, including in Orange County.

113.    Publix directly placed Johnson's Baby Powder products on the market (by selling it) with knowledge that Johnson's Baby Powder products would be used without inspection for defects and dangers.  Publix knew or should have known that the ultimate users and consumers would not and could not know that Johnson's Baby Powder products are defective and unreasonably dangerous for use such as Plaintiff's use.

114.    For the reasons stated above, Johnson's Baby Powder products are defective and unreasonably dangerous.  Johnson's Baby Powder products failed to be safe for regular consumer application as an ordinary consumer would expect, and the risks of regular use of Johnson's Baby

Powder products outweighed any benefits.  Johnson's Baby Powder products lacked adequate warnings or any proper documentation or notice to alert users regarding the hazardous conditions, as stated above, involving the use of Johnson's Baby Powder products.

115.    The Johnson's Baby Powder products purchased by Plaintiffs at Publix were substantially unchanged from their condition when sold and distributed by Publix.

116.    As a result of the defects of Johnson's Baby Powder products discussed above and as a result of Publix's sale of Johnson's Baby Powder products to Plaintiffs, Plaintiff has suffered ovarian cancer, was injured, suffered pain, incurred medical expense, the injuries are permanent or continuing in nature and she will suffer the losses and impairment in the future.

**SIXTH CAUSE OF ACTION**
**LOSS OF CONSORTIUM**

117.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

118.    David Best is the husband of Barbara Best.  As such, he is entitled to his wife's services, support, companionship, affection and consortium.

119.    As a result of the injuries sustained by his wife as alleged above, David Best has lost services, support, companionship, affection and consortium of his wife, and will continue to lose said services, support, companionship, affection and consortium in the future.

WHEREFORE, Plaintiffs demand compensatory damages and trial by jury.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so triable.

-30-

Dated: August 28, 2018

Respectfully submitted,

**SCHLESINGER LAW OFFICES, P.A.**
*Attorneys for Plaintiff*
1212 S.E. 3rd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 320-9507


By: ___/s/ Jeffrey L. Haberman_____
      Jeffrey L. Haberman,
      Florida Bar No.: 98522